**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | BRUNO MARCO CARBONE, | : | Chapter 7 |
| | **Debtor** | : | |
| | | : | Bky. No. 18-13852 ELF |
| LYNN FELDMAN, Trustee, | | : | |
| | **Plaintiff** | : | |
| | v. | : | |
| BRUNO MARCO CARBONE | | : | |
| MELISSA CARBONE, | | : | |
| | **Defendants** | : | Adv. No. 18-239 |

# M E M O R A N D U M

## I.

Debtor Bruno Marco Carbone ("the Debtor") filed a voluntary petition on under chapter 7 of the Bankruptcy Code on June 8, 2018.

The Debtor owns the residential real property located at 90 Cirak Avenue, East Norriton, PA ("the Property") jointly with his wife Melissa Carbone ("Mrs. Carbone").[1] In Schedule C, he claimed the federal exemptions with respect to the Property in the amount of $23,675.00. See 11 U.S.C. §522(b)(2), (d)(1). The Debtor and Mrs. Carbone (collectively, "the Defendants") reside in the Property.

---

[1] In his initial bankruptcy schedules, the Debtor disclosed that he was the sole owner of the Property. He later amended Schedule A/B to disclose the joint ownership.

-1-

On October 22, 2018, Lynn Feldman, the chapter 7 trustee ("the Trustee") commenced the above-captioned adversary proceeding against the Defendants.

In the Complaint, the Trustee alleged that the Debtor solely owned the Property prior to November 30, 2015 and, on that date, transferred his interest in the Property to himself and Mrs. Carbone jointly ("the Transfer"). The Trustee seeks to avoid the Transfer as a fraudulent transfer pursuant to 11 U.S.C. §544 and 12 Pa. C.S. §5104(a) and (b).

Trial of the adversary proceeding was scheduled to be held on September 17, 2020.[2] On September 15, 2020, two (2) days before trial, the parties reported that they had settled the matter.

Thereafter, the parties were unable to memorialize the settlement in a written agreement.

On October 13, 2020, the Trustee filed a Motion to Enforce Settlement Agreement ("the Motion") (Doc # 94). The Defendants filed a response to the Motion on October 28, 2020. (Doc # 97).

A hearing on the Motion was held and concluded on November 18, 2020. Neither party presented any witnesses. Instead, the record consists of a series of e-mails that the parties exchanged prior to informing the court of the "settlement."[3] At the conclusion of the hearing, I

---

[2] Initially, the Hon. Jean K. FitzSimon presided over this adversary proceeding. The scheduling of trial was delayed by the parties' wrangling over a number of pretrial issues, including the propriety of summary judgment. By Memorandum and Order dated March 31, 2020, Judge FitzSimon conclusively denied the Trustee's request for summary judgment.

Although there is no formal reference on the adversary docket, on June 26, 2020, upon Judge FitzSimon's retirement, this adversary proceeding was transferred to the undersigned judge. (See Bky. No. 18-13852, Doc. # 44).

[3] The documents were attached to the Motion as Exs. A through F.

(continued...)

took the matter under advisement.

For the reasons stated below, the Motion will be denied.

## II.

The salient communications regarding settlement of this adversary proceeding were between Joseph Quinn ("Quinn"), the Defendants' counsel and Robert J. Birch ("Birch"), the Trustee's counsel. On September 12, 2020, (five (5) days before trial), Quinn sent Birch a letter (via e-mail attachment), containing a settlement proposal. The September 12, 2020 letter stated, in pertinent part:

> Bruno Carbone and Melissa Carbone would agree to transfer the deed to Bruno Carbone. If the real property were to be marketed and sold by the Estate of Bruno Carbone, Melissa Carbone would be entitled to $25,000 of the proceeds. The Carbones would continue to live in the property during the sale period and would agree to retain insurance on the property and allow a lock box on the property for realtor use.

(Motion, Ex. A).

On September 15, 2020, Birch and Quinn exchanged several e-mails, none of which include any discussion of substantive settlement terms. One of the e-mails indicated that Birch and Quinn were to discuss the possible settlement in a telephone conversation. In subsequent e-mails, Birch and Quinn acknowledge that the parties had reached an agreement. As a result, Birch sent an e-mail to the Courtroom Deputy advising her of the settlement. (Motion, Exs. B, C).

---

[3](...continued)
While no witnesses testified, the attorneys who negotiated the purported settlement both argued in support of their clients' respective positions. Thus, even without formal testimony, counsels' arguments and e-mails have provided me with some insight into their thought processes in entering into the purported settlement.

Although there is no paper trail on the subject, the parties acknowledge that they agreed to reduce the Defendants' initial proposal of a $25,000.00 payment to Melissa Carbon upon a sale of the Property to $17,500.00. Presumably, this reduction was a product of the September 15, 2020 telephone conversation between Birch and Quinn.

On September 29, 2020, Birch sent Quinn a draft settlement agreement. (Motion, Ex. D). The draft provides for:

- the sale of the Property;

- the Defendants' cooperation in the marketing and sale process;

- the Defendants' payment of expenses (taxes, utilities, homeowner's insurance, and mortgage payments) pending the sale;

- the Defendants to vacate the Property upon reasonable notice of sale and closing of the sale (to be provided by the Trustee), and

- payment of $17,500.00 to Mrs. Carbone "after the Trustee's commission, administrative expenses including legal fees, and the mortgages are paid in full."

(Motion, Ex. C).

On or around October 13, 2020, Quinn advised Birch that there were two (2) problems with the draft. According to Quinn: (1) the draft omitted reference to payment of the Debtor's $23,675.00 exemption in the Property and (2) Mrs. Carbone had not agreed that her $17,500.00 was subordinate to the Trustee's commission and administrative expenses in the event that the sales price was inadequate to pay both in full.

The Trustee responded by filing the Motion.

In the Motion, the Trustee reported that the second issue was resolved. The Trustee conceded that the provision subordinating Mrs. Carbone's $17,500.00 payment to the bankruptcy estate's administrative expenses was not part of the settlement agreement and agreed to remove

that provision.

Thus, the sole issue separating the parties is whether the purported settlement provides for payment of the Debtor's exemption claim of $23,675.00 from the sale proceeds of the Property.

### III.

In determining whether a settlement agreement was reached in a matter pending in federal court, federal courts apply state law. United States v. Struble, 489 F. App'x 599, 602 (3d Cir. 2012); see also Blunt v. Lower Merion School Dist., 767 F.3d 247, 282 n. 50 (3d Cir.2014). In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir.2000).

Under Pennsylvania law, the enforceability of settlement agreements is governed by principles of contract law. Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999).

As a general rule, a signed writing is not required unless such signing is expressly required by law or by the intent of the parties. Shovel Transfer Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999); Commerce Bank/Pa. v. First Union Nat. Bank, 911 A.2d 133, 145 (Pa. Super. 2006)). Thus, "[a]n oral settlement agreement may be enforceable and legally binding without a writing. . . . [T]he fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement." Pulcinello v. CONRAIL, 784 A.2d 122, 124 (Pa. Super. Ct. 2001) (citations and quotations omitted).

The most basic requirements for the existence of a contract are the manifestation of mutual assent and consideration. Restatement (Second) of Contracts §17 (1981)

("Restatement");[4] see also Makoroff v. Dep't of Transp., 938 A.2d 470, 472 (Pa. Commw. Ct. 2007). In the absence of manifested mutual assent, no contract is formed. See Spatz v. Nascone, 424 A.2d 929, 936 (Pa. Super. Ct. 1981).

The Restatement further instructs:

> (1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
>> (a) neither party knows or has reason to know the meaning attached by the other; or
>>
>> (b) each party knows or each party has reason to know the meaning attached by the other.

Restatement §20; accord Framlau Corp. v. Upper Dublin School Authority Bd., 281 A.2d 464, 465-66 (Pa. Super. Ct. 1971) (holding that a first party may be bound to a second party's interpretation of their contract where the first party knew that the second party might attach a different meaning to an ambiguous term, yet entered the agreement without clarifying the ambiguity).

As explained below, §20 of the Restatement applies and controls the outcome here.

### IV.

To provide some further context to the parties' dispute, it is helpful to set out some additional background.

In his Amended Schedule A/B, the Debtor listed the Property as having a value of $392,700.00. (Bky. No. 18-13852, Doc. # 14). In Schedule D, the Debtor listed secured claims

---

[4] Pennsylvania courts regularly employ the Restatement (Second) of Contracts when resolving contract disputes. See Hart v. Arnold, 884 A.2d 316, 333 (Pa. Super. Ct. 2005); Felix v Giuseppe Kitchens & Baths, Inc., 848 A.2d 943 (Pa. Super.2004);

against the Property totaling $274,807.79. (Id.). As stated earlier, in Schedule C, the Debtor claimed an exemption of $23,675.00 in the Property.

Thus, in round numbers, if the Trustee accepts the accuracy of the Debtor's valuation, the Property has approximately $118,000 in equity. Of course, before any sale proceeds would be available for payment to owners, professionals and creditors, certain transaction expenses (typically, a brokers' commission and transfer taxes) "come off the top." If we assume sale transaction costs of approximately 10% i.e., about $39,000.00, the potential available proceeds would be approximately $79,000.00.

I am cognizant that the schedules were filed in June 2018, making the Debtor's valuation almost three (3) years old. It is certainly possible, perhaps even likely, that the Property has appreciated considerably since June 2018. And, if the Defendants have been paying the mortgage since then, the liens on the Property likely have been reduced. Thus, the amount available for distribution following sale may well exceed the $118,000 in equity estimated by the Debtor in June 2018.

Absent any transfer avoidance, if the Trustee administered the Property and sold it pursuant to 11 U.S.C. §363(b), Mrs. Carbone would be entitled to one-half of the proceeds of the sale. See 11 U.S.C. §363(j).[5] In addition, the Debtor's exemption of $23,675.00 would be paid ahead of the bankruptcy estate.[6]

---

[5] If the property were sold by the bankruptcy estate, without any avoidance, based on the valuation in the bankruptcy schedules Mrs. Carbone would be entitled to one-half of at least $79,000.00 net sale proceeds. Her offer represented a considerable discount.

[6] On the claims side, there presently seems to be only one (1) filed proof of claim, in the amount of $456,860.62. (The claimant filed two (2) claims in the identical amount, suggesting that one
(continued...)

The situation changes dramatically if the Transfer is avoided and the Property were then sold.

In the successful avoidance scenario, Mrs. Carbone, no longer a co-owner of the Property, would not be entitled to any of the sale proceeds. Further, the Trustee contends that the Debtor's exemption would then be vulnerable based on the potential application of 11 U.S.C. §522(g).[7] Thus, if the Trustee prevailed in this adversary proceeding and §522(g) precludes the Debtor from claiming an exemption in the Property, the bankruptcy estate would receive all of the net sale proceeds.

The Debtor disputes the applicability of §522(g). His position is that by effecting the

---

[6](...continued)
(1) of the claims may be duplicative of the other). But no deadline has been set for filing claims. Aside from the one (1) filed claim, in Schedule E/F, the Debtor disclosed other debts totaling approximately an additional $100,000.00.

Thus, without transfer avoidance, taking into account the existence of administrative expenses, the likely distribution on account of allowed claims likely would be minimal in the absence of an avoidance of the Transfer.

[7]    11 U.S.C. §522(g) provides:

> Notwithstanding sections 550 and 551 of this title, **the debtor may exempt under subsection (b) of this section property that the trustee recovers under section** 510(c)(2), 542, 543, **550**, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, **if**—
>
>> (1) (A) **such transfer was not a voluntary transfer of such property** by the debtor; and
>>
>> (B) the debtor did not conceal such property; or
>>
>> (2) the debtor could have avoided such transfer under subsection (f)(1)(B) of this section.

(emphasis added).

Transfer to himself and his spouse as tenants by the entireties, he relinquished only one half of his interest in the Property. He maintains that, at all times, he retained an interest in the Property (which had sufficient value to permit his full exemption claim). Thus, according to the Debtor, since §522(g) vitiates an exemption only in property interests that were transferred and then recovered by the bankruptcy estate, §522(g) would not divest him of his entitlement to claim an exemption in a property interest that he did not transfer.

So, the parties appear to have come to the negotiating table with different views concerning the legal effect of a successful fraudulent transfer proceeding.

The Trustee viewed the settlement in light of the presumed applicability of §522(g), such that a successful fraudulent transfer would prevent both the Debtor and Mrs. Carbone from receiving any portion of the Property's net sale proceeds. In the Trustee's eyes, the settlement represented a compromise that carved out $17,500.00 from the net sale proceeds only for Mrs. Carbone. As the Defendants made no mention in their settlement proposal concerning the Debtor retaining his exemption, the Trustee argues that the settlement therefore reflects an agreement in which the Debtor would not receive any of the proceeds.

The Defendants perceive the settlement from a different baseline. In their view, because §522(g) would not have applied, the fraudulent transfer action did not endanger the Debtor's entitlement to his exemption from the Property's equity. Thus, the Defendants viewed the settlement offer as a compromise regarding the only party whose entitlement to proceeds from the Property's sale was at stake in the adversary proceeding: Mrs. Carbone. Their settlement offer did not mention the Debtor's entitlement to his claimed exemption because, in their view, §522(g) would not apply.

### V.

The issue before the court is whether the evidence demonstrates the existence of a meeting of the minds, mutual assent and the formation of a contract and, if so, what the terms of the agreement were.

For the reasons stated below, I find that the parties did not reach a meeting of the minds regarding the material term of the purported settlement agreement. Therefore, no contract was formed and the Trustee's Motion will be denied.

### A.

The Trustee's position, that the parties reached a binding settlement that did not include payment of the Debtor's claimed exemption finds support in the plain text of the Defendants' written settlement proposal.

On its face, the Defendants' letter proposes avoidance of the Transfer, a subsequent sale of the Property and payment to Mrs. Carbone of $25,000.00 from the sale proceeds. The anticipated transfer of the Property from the Debtor and Mrs. Carbone back to the Debtor is clear from the plain language of the Defendants' letter: "Bruno Carbone and Melissa Carbone would agree to transfer the deed to Bruno Carbone."[8]

Thus, the Trustee quite reasonably perceived the settlement offer to propose that the Transfer would be avoided (by consent) and, in return for that consent, some value would be paid to Mrs. Carbone, the present owner of an undivided one-half interest in the Property. With

---

[8] The settlement agreement drafted by the Trustee is consistent with the Debtor's proposal. It provides for a sale of the Property "by the Trustee" without any mention of a co-owner.

the avoidance of a transfer and the bankruptcy estate's recovery of an asset that the Debtor transferred voluntarily, the Trustee intuited that 11 U.S.C. §522(g) would apply..

The Trustee's position also is supported by the fact that the Defendants' settlement proposal makes no mention of the Debtor's exemption remaining intact.  In the context of an avoidance of a voluntary transfer by a debtor, with the potential that a debtor's exemption right will be nullified by §522(g), one would expect that a settlement proposal would expressly state that the exemption is preserved.

Thus, the language of the Defendants' settlement offer, as well as the structure of the proposed resolution, does lend some support to the Trustee's position that the parties reached a binding settlement that did not permit the Debtor to claim an exemption in the proceeds from the Property's sale

### B.

### 1.

In response, the Defendants argue that retention of the Debtors' exemption was an implied term of their settlement proposal.  And, they suggest that the implied term was sufficiently obvious that the Trustee accepted the implied term in agreeing to the Defendants' proposal (subject only to the reduction of Mrs. Carbone's share of the sale proceeds from $25,000.00 to $17,500.00).

I disagree, quite simply, for the reasons stated just above in Part V.A..  In fact, in evaluating the record, if there was mutual assent, the Trustee has the better of the argument regarding the terms of the settlement.

Consequently, the only arguable defense to the Motion is that, notwithstanding the text of their written settlement proposal, there was never a true meeting of the minds. On that point, while I find it to be an exceedingly close call, I conclude that the Defendants have the better of the argument. Or, put another way, the Trustee has not convinced me, by a preponderance of the evidence, that there was mutual assent.

**2.**

The basis for my conclusion that there was no mutual assent is rooted in the parties' differing views of the nature of the Debtor's interest in the Property, the effect of avoidance of the Transfer on that interest and the applicability or nonapplicability of 11 U.S.C. §522(g). While the parties' differing conceptions were expressed with some degree of clarity only after the Trustee filed the Motion, I find their submissions and arguments at the hearing on the Motion instructive in considering the mindset of the parties when they purported to reach an agreement in September 2020. While I touched on these differing views in Part IV, at the risk of some prepetition, I will review them again to evaluate the operative issue: was there a meeting of the minds?

The Trustee's invocation of §522(g) is premised on the view that the Transfer involved the Debtor's transfer of the Property from his sole ownership to a separate entity, the tenancy by the entireties estate. The Trustee posits that upon avoiding the transfer and recovering the Property from a separate, non-debtor entity, §522(g) the Property would re-titled as the Debtor's property (and a property of his bankruptcy estate) and §522(g) would apply to prevent the Debtor from claiming any exemption in the Property. This is a plausible, perhaps even

conventional, way to conceptualize the avoidance of the Transfer.[9]

As already mentioned, the Defendants dispute the applicability of §522(g). Their view is that, at all times, the Debtor has held an ownership interest in the Property. According to the Defendants, the Debtor conveyed only a part of his ownership interest through the Transfer and therefore, when he filed his bankruptcy case, he may claim his exemption on his interest in the Property that was not transferred, even if the Trustee recovers the property interest that was transferred in 2015. While this view conflicts somewhat with concept that the entireties estate is a separate entity in which the Debtor owns an undivided one-half interest of the whole, it may be consistent with the settled principle that an individual debtor may claim as exempt his or her interest in entireties property.[10] In other words, while to some extent the entireties entity is distinct from each individual tenant by the entireties, the estate is not so distinct as to preclude the individual tenant from claiming an exemption in property held by the entireties estate.

Given this conceptualization of the nature of a debtor's interest in entireties property, the Defendants posit that the Debtor has had a continuous interest in the Property: he was the sole owner prior to the Transfer and after the transfer he retained an interest in the Property. Thus,

---

[9] In In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007), the Court of Appeals made the following observation regarding the nature of tenancy by the entireties in Pennsylvania:

> **[H]usband and wife are looked upon, together, as a single entity, like a corporation**. The single entity is the owner of the whole estate. When the husband or wife dies, the entity continues, although it is now composed of only one natural person rather than two.

(quoting Ladner on Conveyancing in Pennsylvania, § 1.08 at 16 (John Makdisi, ed., rev. 4th ed.1979)).

[10] See Brannon, 476 F.3d at 174-75 (debtor can claim an exemption in property in which his or her interest is held as a tenant by the entireties).

according to the Debtor, there is no reason why he cannot claim his exemption in the portion of his ownership interest that he retained even after the Transfer.

Further, the Defendants suggest that absent some waiver or acknowledgment of the loss of his legal right to his exemption, there was no reason for the Trustee to assume that the Debtor was not conceding away his exemption rights when the Defendants made their settlement proposal.

I need not determine whose view of the law is correct. What matters is that the parties had these differing conceptions when they purported to settle the matter. The question is whether the consequence of the differing perceptions is that there was no meeting of the minds.

To answer that question, I return to §20 of the Restatement. I find that the answer to the question at hand is found in §20(1)(a). The operative text is worth repeating here:

> (1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
>> (a) neither party knows or has reason to know the meaning attached by the other . . . .

Restatement §20.

In applying this standard, I have no difficulty concluding that the parties attached materially different meanings to their manifestations of assent – the Trustee believing that the sole carve-out from the net proceeds of sale would be the $17,500.00 payment to Mrs. Carbone, based in part on the applicability of 11 U.S.C. §522(g)); and the Defendants believing that §522(g) was inapplicable and that their written settlement proposal included an implied term that preserved the Debtors' exemption. The question, then is whether "neither party knew or had reason to know the meaning to the settlement terms attached by the other."

On the Trustee's side, the answer is easy. As stated previously, perhaps the more natural interpretation of the settlement offer is that the sole "carve-out" for the Defendants was the $17,500.00 payment to Mrs. Carbone. It is very likely that the Trustee did not know – and I am satisfied that she had no reason to know – that the Defendants theory of the case included the abstract conceptualization of the Transfer as one in which the Debtor conveyed only a part of his ownership interest to the tenancy by the entireties estate and that he necessarily retained the right to exempt that portion of his ownership interest in the Property that he claims remained with him after the Transfer.

The question whether the Defendants neither knew or had reason to know that the Trustee interpreted their proposal as eliminating the Debtor's exemption is a much closer question.

On the one hand, one might say that any debtor that is a transfer avoidance defendant necessarily has reason to know that 11 U.S.C. §522(g) may come into play. Where a proposed settlement of a transfer avoidance action includes a recovery of a voluntary transfer of the debtor, the applicability of §522(g) following the recovery of the subject property by the estate may be intuitive. Thus, the context of the Defendants' settlement negotiation lends some support for finding that they had reason to know of the meaning the Trustee attached to their settlement offer. And if so, §20(1)(a) of the Restatement would not compel the conclusion that the no settlement agreement was reached due to the absence of mutual assent.

On the other hand, this case involves the Debtor's transfer of the Property not to a conventional, obvious third party, but instead to the somewhat mystical entity known as a tenancy by the entireties (an entity in which the Debtor has an interest). Further, the Debtor had

long claimed an exemption in the Property and the Trustee had filed no objection to his claimed exemption. The Defendants perceived the exemption as legitimate and allowable because, in their view, the Debtor had transferred away only a part of his ownership interest. In other words, from the Defendants' perspective, why would they expect the Trustee to challenge the Debtor's exemption claimed in the value of the Property that he had not transferred away? And, if the Defendants had no reason to think that the Trustee would challenge the exemption, why would they find it necessary include language regarding that exemption in their settlement offer?

Further, nothing in the record suggests that the subject of the Debtor's exemption was ever discussed. Thus, to the extent that the Defendants had some reason to believe that the Debtor's exemption remained viable, nothing in the record regarding the parties' negotiations put them on notice that the Trustee viewed it otherwise.

At bottom, I consider it more likely than not that the preservation of the Debtor's exemption was a term that both parties overlooked and forgot to clarify. Had the issue been discussed, the negotiation regarding the exemption could have gone either way (or been compromised) in an agreement.

As stated earlier, I find this to be a close call. To some extent, the evidence is in equipoise and in that situation, the outcome is determined by the burden of proof. With the Trustee bearing the burden of proof on the Motion as the moving party, I conclude that she had not met that burden. The Trustee has not established, by a preponderance of the evidence, that the Defendants knew or had reason to know that the Trustee would interpret their offer as eliminating the Debtor's claimed exemption in the Property's equity.

Since neither party knew or had reason to know of the meaning attached by the other

party, §20(1)(a) of the Restatement applies, showing a lack of mutual assent to the purported settlement agreement.

## VI.

For the reasons stated above, I conclude that there was no meeting of the minds, no mutual assent on the material terms of the proposed settlement and therefore, no settlement agreement was reached.

The Motion will be denied.

Date: **March 12, 2021**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**